United States District Court
Northern District of California

YELP INC.,

            Plaintiff,

    v.

TIMOTHY CATRON; DOES 1-50,

            Defendants.

Case No.: 13-cv-02859-KAW

ORDER REASSIGNING CASE TO DISTRICT JUDGE; AND REPORT AND RECOMMENDATION TO GRANT IN PART AND DENY IN PART PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT

        Plaintiff Yelp Inc. moves for default judgment against Defendant Timothy Catron for trademark infringement under 15 U.S.C. § 1114, unfair competition under 15 U.S.C. § 1125(a), dilution of a famous mark under 15 U.S.C. § 1125(c), cybersquatting under 15 U.S.C. § 1125(d), unfair competition under California Business and Professions Code § 17200, false advertising under California Business and Professions Code § 17500, breach of contract, and intentional interference with contractual relations. (Pl.'s Mot. for Default J. "Pl.'s Mot.," Dkt. No. 17.)  The clerk entered Plaintiff's motion for default on April 3, 2014. (Dkt. No. 18.)  Yelp seeks injunctive relief, statutory damages pursuant to 15 U.S.C. § 1117(c), and an award of attorneys' fees and costs.

        On August 21, 2014, the Court held a hearing on Plaintiff's motion for default judgment, where Defendant did not appear.

        Since Defendant, by the very virtue of being in default, has not consented to the undersigned, the Court reassigns this action to a district judge and recommends that Plaintiff's motion be GRANTED IN PART AND DENIED IN PART.

## I.        BACKGROUND AND PROCEDURAL HISTORY

        Plaintiff Yelp owns and operates popular websites (collectively, the "Yelp Site"), which feature information about local businesses nationwide and around the world, including ratings,

reviews, and photos.  (Pl.'s Mot. at 2; Compl., Dkt. No. 1 ¶ 2.)  Yelp owns seven service marks (collectively "Yelp Marks"), which have U.S. Patent and Trademark Office Registration Nos. 3,660,122; 3,660,119; 3,181,664; 3,938,129; 3,660,123; 3,660,120; and 3,316,616. (Compl. ¶¶ 32-34.)  These represent three distinguishable marks. *Id.*

Access to, and use of, the Yelp Site is governed by Yelp's Terms of Service, which Yelp asserts is displayed prominently on the Yelp Site.  (Compl. ¶ 8.)  In order to contribute reviews to the Yelp Site, an individual must create a user account, which requires affirmative acceptance of the terms of service.  (*Id.*)  Yelp's terms of service prohibit paid reviews on the Yelp Site. (Compl. ¶ 3.)

In January 2013, Yelp learned that AdBlaze was offering to sell Yelp reviews to the public. (Compl. ¶¶ 15, 23, Exs. A, 6.)  On January 29, 2013, Yelp conducted a WhoIs search that revealed that AdBlase was registered to Timothy Catron using an email address timcatron@gmail.com.  Timothy Catron is, or at all relevant times has been, the registrant, owner, and content provider of the websites *adblaze.com* and *BuyYelpReview.com*.  (Compl. ¶ 10.) Defendant created an individual Yelp user account on November 11, 2012 and a business account for AdBlaze on November 12, 2012 which he used to offer gift certificates and discounts related to AdBlaze's services.  (Compl. ¶¶ 20-21.)  Both accounts were registered with the same timcatron@gmail.com email address.  *Id.*  In creating the accounts, Defendant repeatedly agreed to the Yelp's terms of service.  *Id.*

On January 30, 2013, Yelp sent a letter to Catron demanding that he cease from his violation of the Yelp terms of service through selling Yelp reviews, cease using Yelp's registered trademarks, and provide Yelp information about the reviews he had posted.  (Compl. ¶ 16.)  In response, Defendant refused to provide any of the information Yelp sought, but responded on February 5, 2013 that "[a]ny mention of Yelp has been removed from Adblaze.com." (*Id.*; Compl., Ex. 3.)  On March 24, 2013, Catron promoted a different website *BuyYelpReview.com* on Twitter. (Compl. ¶ 18.)  This new website charged $24.95 per Yelp review. (Compl. ¶ 19.)

In early 2013, Yelp allegedly purchased false reviews from Defendant through *BuyYelpReview.com* for a fictitious business Yelp created. (Compl. ¶ 24.)  Yelp received and

2

approved the content of the fake reviews through email correspondence, and the reviews eventually appeared on the fictitious business's Yelp listing. *Id.*

Yelp filed the instant suit on June 20, 2013 alleging trademark infringement under 15 U.S.C. § 1114, unfair competition under 15 U.S.C. § 1125(a), dilution of a famous mark under 15 U.S.C. § 1125(c), cybersquatting under 15 U.S.C. § 1125(d), unfair competition under California Business and Professions Code § 17200, false advertising under California Business and Professions Code § 17500, breach of contract, and intentional interference with contractual relations.

Defendant Catron was served with the summons and complaint on July 3, 2013.  (Dkt. No. 8.)  Defendant did not answer or otherwise respond to the complaint.  On April 1, 2014, Yelp filed a motion for entry of default.  (Dkt. No. 15.)  The Clerk entered the default against Catron on April 3, 2014. (Dkt. No. 18.)  On April 2, 2014, Yelp filed a motion for default judgment seeking injunctive relief, statutory damages under 15 U.S.C. §1117(c), and attorneys' fees and costs. (Pl.'s Mot. at 13-16.)  On June 13, 2014, Yelp filed supplemental briefing in support of its request for attorneys' fees and costs. (Dkt. Nos. 26 & 27.)

## II.    DEFAULT JUDGMENT

### A.  Legal Standard

Federal Rule of Civil Procedure 55(b)(2) permits a court to enter a final judgment in a case following a defendant's default. *Shanghai Automation Instrument Co. v. Kuei*, 194 F. Supp. 2d 995, 999 (N.D. Cal. 2001). Whether to enter a judgment lies within the court's discretion. *Id.* at 999 (citing *Draper v. Coombs*, 792 F.2d 915, 924-25 (9th Cir. 1986)).

Before assessing the merits of a default judgment, a court must confirm that it has subject matter jurisdiction over the case and personal jurisdiction over the parties, as well as ensure the adequacy of service on the defendant. See *In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999). If the court finds these elements satisfied, it turns to the following factors ("the Eitel factors") to determine whether it should grant a default judgment:

> (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action[,] (5) the possibility of a

United States District Court
Northern District of California

dispute concerning material facts[,] (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decision on the merits.

*Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986) (citation omitted).  In this analysis, "the well-pleaded allegations of the complaint relating to a defendant's liability are taken as true." *Pepsico, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1175 (C.D. Cal. 2002) (citing *Televideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917-18 (9th Cir. 1987)).  Nevertheless, default does not compensate for essential facts not within the pleadings and those legally insufficient to prove a claim. *Cripps v. Life Ins. Co. of N. Am.*, 980 F.2d 1261, 1267 (9th Cir. 1992).  The Court, however, has the discretion to consider competent evidence and other papers submitted with a motion for default judgment to determine damages.  *Shanghai Automation Instrument Co., Ltd. v. Kuei*, 194 F. Supp. 2d 995, 1000, 1010 (N.D. Cal. 2001) (citing *TeleVideo Systems, Inc. v. Heidenthal*, 826 F.2d. 915, 917 (9th Cir. 1987)).

**B.  Subject Matter Jurisdiction**

This Court has subject matter jurisdiction over this matter because Yelp raises claims under federal law, specifically trademark infringement under 15 U.S.C. § 1114, unfair competition under 15 U.S.C. § 1125(a), dilution of a famous mark under 15 U.S.C. § 1125(c), cybersquatting under 15 U.S.C. § 1125(d).  29 U.S.C. §§ 1331, 1338.

This Court has supplemental jurisdiction over the pendent state law claims, specifically unfair competition under California Business and Professions Code § 17200, false advertising under California Business and Professions Code § 17500, breach of contract, and intentional interference with contractual relations, pursuant to 28 U.S.C. § 1367(a), because these claims are so related to Yelp's claims under federal law that they form part of the same case or controversy.

**C.  Personal Jurisdiction**

Defendant Catron agreed to be bound to Yelp's terms of service.  (Compl. ¶¶ 20, 21.)  By doing so, Catron agreed to "submit and consent to the personal and exclusive jurisdiction in, and the exclusive venue of, the state and federal courts located within San Francisco County, California."  (Compl. ¶ 27, Ex. 1, Sec. 13).  Therefore, this Court has personal jurisdiction over Catron.  *See Nat'l Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311, 316 (1964).

United States District Court
Northern District of California

Further, California's long-arm statute authorizes specific personal jurisdiction over nonresident defendants to the full extent permitted by the Due Process Clause of the United States Constitution. *See Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1320 (9th Cir. 1998). Thus, this Court may assert specific personal jurisdiction over nonresident defendants if three requirements are met:

> (1) The nonresident defendant must do some act or consummate some transaction with the forum or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or results from the defendant's forum-related activities; and (3) exercise of jurisdiction must be reasonable.

*Id.* (quotation marks and citation omitted). Yelp bears the burden of satisfying the first two requirements; the burden then shifts to the defendant to present a "compelling case" that the exercise of jurisdiction would be unreasonable. *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1228 (9th Cir. 2011) (citations omitted).

    1.  <u>Purposeful Direction</u>

The first requirement encompasses two distinct concepts: purposeful availment and purposeful direction. *See Yahoo!, Inc. v. La Ligue Contre Le Racisme Et L' Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006). Tort claims and tort-like claims—including intellectual property claims—are analyzed under the purposeful direction concept. *See Craigslist, Inc. v. Kerbel,* C-11-3309 EMC, 2012 WL 3166798, at *4 (N.D. Cal. Aug. 2, 2012)("In analyzing purposeful direction, the Court applies the 'effects' test in *Calder v. Jones*, 465 U.S. 783 (1983)."). Jurisdiction is proper under the effects test if the defendant "(1) committed an intentional act, which was (2) expressly aimed at the forum state, and (3) caused harm, the brunt of which is suffered and which the defendant knows is likely to be suffered in the forum state." *Id.* (citing *Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000)). All three requirements are met here.

///

///

5

First, Catron committed intentional acts:  he purposefully advertised to sell authentic Yelp reviews, sold Yelp reviews, and used Yelp's registered trademarks.  (Compl. ¶¶ 4, 19, 23, 24; Compl., Exs. A, 4, 6.)

Second, Catron expressly aimed his conduct at this forum.  Express aiming exists where "the defendant is alleged to have engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state." *CollegeSource, Inc. v. Academyone, Inc.*, 653 F.3d 1066, 1077 (9th Cir. 2011) (internal quotation marks and citations omitted).  Here, Catron targeted Yelp, a company he knew to be located in California, by advertising to sell authentic Yelp reviews, selling Yelp reviews, and using Yelp's registered trademarks.  (*See* Compl. ¶¶ 15, 18, 19, 24, 35, 46, 55, 64, 68, 77, 89, 94, Ex. 2, 3.)  Catron also harmed Yelp by confusing its customers and capitalizing on this confusion by using Yelp's Marks in its domain name and on its website.  (Compl. ¶¶ 35, 45-46, 54, 64.)  This constitutes aiming his conduct at Yelp and this forum.  *See, e.g.*, *CollegeSource*, 653 F.3d at 1077 ("[W]e have held that the 'expressly aimed' prong of the purposeful direction test can be met where a plaintiff alleges that the defendant individually targeted him by misusing his intellectual property on the defendant's website for the purpose of competing with the plaintiff in the forum.") (citation omitted); *Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1020 (9th Cir. 2002) ("[O]perating even a passive website in conjunction with 'something more'—conduct directly targeting the forum—is sufficient to confer personal jurisdiction."); *eAdGear, Inc. v. Liu*, No. CV-11-05398 JCS, 2012 WL 2367805, at *7 (N.D. Cal. June 21, 2012) (express aiming found where defendant used an infringing domain name to "confus[e] consumers as to the origin of Defendant's services")

Third, Defendant Catron knew he would cause harm in California because his scheme was directed at Yelp's website, a company he knew to be located in California.  *See also craigslist, Inc. v. Naturemarket, Inc.*, 694 F. Supp. 2d 1039, 1053 (N.D. Cal. 2010) ("Because Plaintiff is headquartered in California and maintains its website in California, Defendants' actions directly targeted California, and Defendants knew that Plaintiff would suffer the brunt of its harm in California.").

///

6

2. <u>Arising from forum-related activities</u>

This element is established if Yelp would not have been injured "but for" the nonresident defendant's forum-related activities. *See Ballard v. Savage*, 65 F. 3d 1495, 1500 (9th Cir. 1995). As explained above, Defendant expressly targeted Yelp, a company located in California, and Yelp suffered injury from Catron's schemes in this forum. *See CollegeSource*, 653 F.3d at 1079 ("We have repeatedly held that a corporation incurs economic loss, for jurisdictional purposes, in the forum of its principal place of business."); *Nissan*, 89 F. Supp. 2d at 1160 ("[T]he defendant's intentional exploitation of the plaintiffs' goodwill and diversion of the plaintiffs' potential customers [via the Internet] had the effect of injuring [plaintiffs] in California. But for the [defendant's] conduct, this injury would not have occurred.").

Yelp expends a significant amount of resources to remedy the actions of fake review posters, such as the actions taken by Catron. (Pl.'s Mot. at 12.) This includes costs for increased equipment, bandwidth, and personnel to develop counter measures, investigate incidents, remove unauthorized posts, and address user complaints caused by fake reviews. *Id.*

3. <u>Reasonableness</u>

Because the first two requirements for exercising specific personal jurisdiction has been established, the nonresident defendant must present a "compelling case" that asserting jurisdiction would be unreasonable. *Mavrix*, 647 F. 3d at 1228 (citations omitted). Defendant Catron has essentially waived his opportunity to make this showing by failing to participate in this litigation. Nonetheless, the assertion of personal jurisdiction in this instance is not unreasonable given the fact that Catron targeted Yelp, a company he knew to be located in California, through his scheme. Thus, Catron had "fair warning" that he might be sued in California. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (internal quotation marks and citation omitted); *see also World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980) (personal jurisdiction in a remote forum is reasonable if the defendant "should reasonably anticipate being haled into court there").

///

///

7

United States District Court
Northern District of California

**D.   Venue**

Venue is proper in the Northern District of California under 28 U.S.C. § 1391, as Yelp is located within the Northern District.

**E.   Analysis of the *Eitel* Factors**

Since the Court has jurisdiction in this matter, this Court must turn to the *Eitel* factors to determine whether the entering of a default judgment is appropriate in this matter.

1.   Prejudice to Plaintiff

Plaintiff Yelp will suffer prejudice if the court does not enter default judgment because it would be left without recourse to recover for the harm already inflicted by Catron and to prevent future infringement.  *PepsiCo, Inc.*, 238 F. Supp. 2d at 1177.  Plaintiff would, therefore, be prejudiced if the Court did not enter default judgment.

2.   Merits of Plaintiff's Claims & Sufficiency of the Complaint

For ease of analysis, the merits of Plaintiff's substantive claims and sufficiency of the complaint are considered together.

a.     *Trademark Infringement (15 U.S.C. § 1114)*

15 U.S.C. § 1114 provides that a person shall be liable in a civil action by a registrant owner of marks if that person, without the consent of the registrant, uses "in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive."  At the very least, Yelp asserts Catron's use of the Yelp Marks will cause initial interest confusion.  (Pl.'s Mot. at 9.)  "Initial interest confusion occurs when the defendant uses the plaintiff's trademark in a manner calculated to capture initial consumer attention, even though no actual sale is finally completed as a result of the confusion." *Interstellar Starship Services, Ltd. v. Epix, Inc.*, 304 F.3d 936, 941 (9th Cir. 2002) (internal citations and quotation marks omitted).  The Ninth Circuit employs a non-exclusive eight-factor test to determine the likelihood of confusion.[1]  *Playboy Enter., Inc. v. Netscape Commc'n*, 354 F.3d 1020, 1026 (9th Cir. 2004).

---

[1] The eight factors are:

United States District Court
Northern District of California

1    Catron used the Yelp Marks, without alteration, in connection with his review-selling

2   business without Yelp's consent in a manner that is likely to cause confusion, mistake, or to

3   deceive.  (Compl. ¶ 35, Exs. A, 4, 6.)  Catron displayed the Yelp Marks prominently on

4   *adblaze.com* and *BuyYelpReview.com* in connection with his business, because he was selling

5   Yelp reviews. (Exs. A, 6.)

6    An argument could be made that Catron was employing nominative fair use, but that is a

7   defense that must be raised during litigation. *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d

8   1171, 1175 (9th Cir. 2010).  Even if Catron appeared, which he obviously did not, this case is

9   distinguishable from *Toyota*, where the defendants were using the Lexus Mark in connection with

10  truthful communications between buyers and sellers, and their bona fide automobile broker

11  business was not otherwise accused of being unauthorized or unlawful. *Id.* at 1176.  Here,

12  Catron's conduct exceeds simply using Yelp Marks without permission, as he is accused of

13  selling reviews in violation of both state law and Yelp's terms of service.  Thus, based on the

14  facts alleged, the nominative fair use defense would not be available.

15   Accordingly, Yelp has sufficiently stated a claim for trademark infringement.

16     *b.    Unfair Competition (15 U.S.C. § 1125(a))*

17   15 U.S.C. § 1125(a) provides that:

18       any person who, . . . in connection with . . . services, . . . uses in
        commerce any word, term, name, symbol, or device, . . . which is
19       likely to cause confusion, or to cause mistake, or to deceive as to
        the affiliation, connection, or association of such person with
20       another person, or as to the origin, sponsorship, or approval of his
        or her goods, services, or commercial activities by another person,
21       . . . shall be liable in a civil action by any person who believes that
        he or she is or is likely to be damaged by such act.
22

23

24   _____

25   (I)    strength of the mark;
    (II)    proximity of the goods;
26   (III)   similarity of the marks;
    (IV)    evidence of actual confusion;
27   (V)    marketing channels used;
    (VI)    type of goods and the degree of care likely to be exercised by the purchaser;
28   (VII)   defendant's intent in selecting the mark; and
    (VIII) likelihood of expansion of the product lines.

United States District Court
Northern District of California

Catron has made commercial use of the Yelp Marks and Yelp's trade name, "Yelp", in connection with his business and these acts have caused injury to Yelp's good will and reputation. (Compl. ¶¶ 45, 50.)  Catron displayed these marks prominently on *adblaze.com* and *BuyYelpReview.com* in a manner that is likely to cause confusion, mistake, or to deceive as to its affiliation, connection, or association of Yelp with his review-selling business.  (Compl. ¶ 46; Compl., Exs. A, 6.)

   c.    *Dilution of a Famous Mark (15 U.S.C. § 1125(c))*

Yelp alleges that Catron's use of the Yelp Marks have diluted and will continue to result in the dilution of the distinctive nature of the Yelp Marks through blurring.  (Compl. ¶ 55.)  15 U.S.C. § 1225(c)(1) entitles the owner of a famous mark to "an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring . . . of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury."  The statute further provides that "a mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner" and provides a non-exclusive list of four factors a court may consider.[2]  15 U.S.C. § 1225(c)(2)(A).  Dilution by blurring is defined as the "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark."[3]  *Id.* § 1225(c)(2)(B).

---

[2] The four factors are:
   (I)   The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.
   (II)  The amount, volume, and geographic extent of sales of goods or services offered under the mark.
   (III) The extent of actual recognition of the mark.
   (IV)  Whether the mark was registered under the Act of March 3, 1881 or the Act of February 20, 1905, or on the principal register.

[3] The statute lists the following six factors as a non-exclusive list a court may consider if a mark or trade name is likely to cause dilution by blurring:
   (I)   The degree of similarity between the mark or trade name and the famous mark.
   (II)  The degree of inherent or acquired distinctiveness of the famous mark.
   (III) The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark.

United States District Court
Northern District of California

The Yelp Marks are famous marks within the meaning of the Anti-Dilution Act.  The Yelp Marks are registered on the principal register.  (Compl. ¶ 33.)  The reach of publicity of the Yelp Marks is extensive, as the Yelp Site averaged 102 million monthly unique visitors between January and March 2013.  (Compl. ¶ 2)  As of the date of the filing of this action, the Yelp Site contained over 39 million reviews.  (*Id.*)  Therefore, the Yelp Marks are widely recognized by the general public of the United States as a designation of the source of the services of Yelp.

Catron's use of the Yelp Marks is likely to cause dilution by blurring of the Yelp Marks, because his websites use the Yelp Marks.  (Compl. ¶ 4; Compl. Exs. A, 4, 6.)  As stated above, over 100 million users visited the Yelp Site where the Yelp Marks are displayed.  Thus, Catron's use of the Yelp Marks in connection with his review-selling business impairs the distinctiveness of the Yelp Marks.

### d.    Cybersquatting (15 U.S.C. § 1125(d))

Generally, a defendant is directly liable under § 1125(d) if he (1) registers, traffics in, or uses a domain name that is (2) identical or confusingly similar to a famous or distinctive mark owned by the plaintiff with (3) a bad-faith intent to profit from the mark.  *See, e.g., DSPT Int'l, Inc. V. Nahum*, 624 F.3d 1213, 1218-19 (9th Cir. 2010).  In determining bad faith, courts evaluate the unique circumstances of the case; survey the nine bad-faith factors set forth in § 1125(d);[4] and

---

(IV)  The degree of recognition of the famous mark.
(V)   Whether the user of the mark or trade name intended to create an association with the famous mark.
(VI)  Any actual association between the mark or trade name and the famous mark.

[4] The Court may consider, but is not limited to, the following nine factors when determining bad faith:

(I) the trademark or other intellectual property rights of the person, if any, in the domain name;

(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a

United States District Court
Northern District of California

consider the availability of § 1125(d)'s statutory safe-harbor defense, which protects any defendant who "believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1220 (9th Cir. 2012) (quoting 15 U.S.C. § 1125(d)(1)(B)(ii) (internal quotations omitted)). The unique circumstances of the case are "the most important grounds for finding bad faith." *Lahoti v. Vericheck, Inc.*, 586 F.3d 1190, 1202 (9th Cir. 2009) (quoting *Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 304 F.3d 936, 946 (9th Cir. 2002)(internal quotations omitted)).

Catron registered and operates the internet domain name *BuyYelpReview.com*. (Compl. ¶ 61.)  The issue then is whether the domain name is identical or confusingly similar to the Yelp Marks.  Under § 1125(d), the confusingly similar analysis is "narrower than the traditional multifactor likelihood of confusion test for trademark infringement." *Coca-Cola Co. v. Purdy*, 382 F.3d 774, 783 (8th Cir. 2004); *see also DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1222 (9th Cir. 2010).  The only relevant question is "whether the domain names which [the defendant] registered . . . are identical or confusingly similar to a plaintiff's mark."  *Purdy*, 382 F.3d at 783. Domain names may be confusingly similar to a protected mark if they incorporate the mark or if they add, delete, or rearrange letters in the mark. *See Shields v. Zuccarini*, 254 F.3d 476, 483 (3d

---

likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;
(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;
(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;
(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and
(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section.
15 U.S.C. § 1125(d)(1)(B)(i).

Cir. 2001). Domain names may also be confusingly similar if they simply add "generic terms . . .

[or] a top level domain suffix" to the plaintiff's mark. *See Purdy*, 382 F.3d at 784.

Here, Catron's domain name, *BuyYelpReview.com*, incorporates the Yelp Marks and

simply add generic terms (i.e. "buy" and "review") surrounding the Yelp Marks.  Thus, Catron's

domain name is confusingly similar under § 1125(d).

Catron acted with a bad-faith intent to profit off of the Yelp Marks by virtue of his

registration and usage of the infringing domain name in order to sell his review services and make

money. *See, e.g.*, *Citigroup Inc. v. Malik*, No. 1:07cv1168, 2009 WL 874497, at *3 (E.D. Va.

Mar. 24, 2009).  Here, the *BuyYelpReview.com* domain reveals Catron's intent to illicitly profit

from the Yelp Marks as there is no value independent of the infringement, as evidenced by the

lack of association with any bona fide goods or services.

Other bad-faith factors set forth in the ACPA also weigh against Catron, including his lack

of intellectual property rights in the domain name, domain name does not consist of his legal

name or a name that identifies him, no prior use of the domain name in connection with the bona

fide offering of any goods or services, his lack of a bona fide noncommercial or fair use of the

mark in a site accessible under the domain name, and his attempt to hide his website registration

information behind a proxy account service.  15 U.S.C. § 1125 (d)(1)(B)(i)(I), (II), (III), (IV),

(VII).

Lastly, Catron cannot invoke the ACPA's safe harbor provision, which protects "parody

and comment, and use by persons ignorant of another's superior right to the mark." *Nahum*, 624

F.3d at 1220.  Since Catron was in engaged in selling services in order to make money, he was

not engaged in parody, comment, or other lawful use.  Nor was Catron ignorant of Yelp's superior

right to the Yelp Marks, as he allegedly continued to use the Yelp Marks after receiving a cease

and desist letter.  (Compl. ¶¶ 16, 18.)

e.      *State False Advertising*

Yelp's complaint alleges that Catron engaged in false advertising pursuant to California

Business and Professions Code § 17500.  In order to prevail, Yelp must show that Catron

intended to perform services, and that he publicly disseminated advertising which: (1) contained a

statement which was untrue or misleading, (2) which the defendant knew, or in the exercise of reasonable care should have known, was untrue or misleading, and (3) which concerned the services or their disposition or performance.  Cal. Bus. & Prof. Code § 17500.

Here, Yelp adequately alleges that Catron intended to perform services because he actually performed these services when Yelp surreptitiously purchased his services.  (Compl. ¶ 24.)  Catron also publicly disseminated advertising which offered these services.  (Compl., Exs. 4-6.)  By advertising "We offer 100% real reviews . . ." and "100% Real Reviews" Catron's advertisements contained untrue or misleading statements, because these reviews were to be drafted without patronizing the business in question.  (Compl. ¶ 79.)  As Catron was the one who drafted these reviews, he knew that they were not real reviews.  (*See* Compl. ¶¶ 18, 19.)  Catron's advertisements also offered assurances that its reviews "will not be filtered out." (Compl. Exs. 6.)  Despite these promises, however, the reviews Catron advertises were filtered out as evidenced by the reviews Yelp purchased from Catron.  (Compl. ¶ 24.)  Thus, Catron was engaged in false advertising.

### f.    State Unfair Competition

Yelp alleges that Catron's conduct constituted fraudulent, unlawful, and unfair competition as defined by California Business and Professions Code §§ 17200, *et seq.* (Compl. ¶¶ 67-75.)  The evidence supporting Yelp's federal claims and state false advertising claims are also sufficient to establish Catron's liability under California's Unfair Competition Law.

The Unfair Competition Law coverage embraces anything properly called a business practice and forbidden by law and has held "section 17200 borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." *Cal-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.* 20 Cal. 4th 163, 180 (1999) (internal citations and quotations omitted).  The Ninth Circuit has "consistently held . . . actions pursuant to California Business and Professions Code § 17200 are substantially congruent to claims made under the Lanham Act. *Cleary v. News Corp.*, 30 F.3d 1255, 1262-63 (9th Cir. 1994) (internal quotations omitted); *see also Philip Morris v. Shalabi*, 352 F. Supp. 2d 1067, 1072 (C.D. Cal. 2004) (noting that the essential elements of 15 U.S.C. § 1114(1), § 1125(a)(1) "are

1  identical and if met with adequate evidence are sufficient to establish liability under" Cal. Bus. &

2  Prof. Code § 17200 as well).

3       Here, Catron engaged in the business practice of selling Yelp reviews, which violates 15

4  U.S.C. §§ 1114(1) and 1125(a)(1). (Compl. ¶ 69.)  Thus, Yelp has sufficiently stated a claim

5  under § 17200.

6              **g.**     *Breach of Contract*

7       Yelp alleges a claim for breach of contract.  A claim for breach of contract is comprised of

8  a contract, plaintiff's performance or excuse for nonperformance, defendant's breach, and the

9  resulting damages to plaintiff.  *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.* 222 Cal. App. 3d.

10  1371, 1388 (Cal. App. 1990).

11       Here, the Yelp terms of service is a contract.  Yelp has performed all conditions,

12  covenants, and promises required on its part in accordance with the terms of service.  (Compl. ¶

13  88.)  Catron agreed to the terms of service in creating a business account on Yelp, as well as in

14  creating his own personal account.  (Compl. ¶¶ 20-21.)  In doing so, Catron agreed not to "assist,

15  encourage, or enable others to use the Site to . . . Violate [Yelp's] Content Guidelines, for

16  example, by writing a fake or defamatory review, . . . or being compensated to write or remove a

17  review." (Compl. ¶ 86, Ex. 1.)  Catron also agreed to not "use the Service for commercial

18  purposes, except in connection with a Business Account and as expressly permitted by Yelp."

19  (Compl. ¶ 87, Ex. 1.)  Catron breached the terms of service by selling reviews, drafting fake

20  reviews, and using the Yelp Site for commercial purposes other than in connection with a

21  Business Account for authorized purposes.  (Compl. ¶¶ 24, 89; Compl., Exs. A, 4.)  As a result of

22  this breach, Catron has caused damage to Yelp.  (Compl. ¶ 90.)

23       Thus, Yelp has sufficiently stated a claim for breach of contract.

24              **h.**     *Intentional Interference with Contractual Relations*

25       Yelp's complaint also alleges a claim for intentional interference with contractual

26  relations.  The elements for the tort of intentional interference with contractual relations are "(1) a

27  valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3)

28  defendant's intentional acts designed to induce a breach or disruption of the contractual

relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Quelimane Co. v. Stewart Title Guaranty Co.*, 19 Cal. 4th 26, 55 (1998).  Although this is an intentional tort, a defendant does not need to act with specific intent to interfere to be held liable.  *Davis v. Nadrich*, 174 Cal. App. 4th 1, 11 (Cal. App. 2009).  Instead, the tort will apply if the defendant knew that the interference was certain or substantially certain to occur as a result of his or her action.  *Id.*  Thus, this rule will apply "to an interference that is incidental to the actor's independent purpose and desire but known to him to be a necessary consequence of his action." *Quelimane Co.*, 19 Cal. 4th at 56.

Yelp maintains contracts with each user that submits a review to the Yelp website and all users must agree to the Yelp terms of service.  (Compl. ¶ 92.)  Catron has knowledge of these contracts because he agreed to abide by the same terms of service when he created his own user accounts.  (Compl. ¶¶ 84, 93.)  Catron intended to disrupt performance of these contracts, and prevented performance of these contracts by encouraging Yelp users to write fake or defamatory reviews, trade reviews, and compensate or be compensated to write or remove a review.  (Compl. ¶ 94; Ex. 6.)  As a result of Catron's actions, fake reviews have been posted on the Yelp Site, resulting in some harm to Yelp.  (Compl. ¶ 95.)

### 3. Sum of Money at Stake

The fourth *Eitel* factor focuses on the amount at issue in the action, as courts should be hesitant to enter default judgments in matters involving large sums of money. "When the money at stake in the litigation is substantial or unreasonable, default judgment is discouraged." *Bd. of Trs. v. Core Concrete Const., Inc.*, No. C 11-2532 LB, 2012 WL 380304, at *4 (N.D. Cal. Jan. 17, 2012) (citing *Eitel*, 782 F.2d at 1472). However, when "the sum of money at stake is tailored to the specific misconduct of the defendant, default judgment may be appropriate." *Id.* (citations omitted).

Yelp seeks statutory damages in the amount of $2,000,000.00 pursuant to 15 U.S.C. § 1117(c)(2).  Although the Court finds this amount excessive and recommends a lesser amount below, $2,000,000.00 nonetheless is reasonable under *Eitel*, as the statute provides for a maximum of $2,000,000.00 per counterfeit mark per type of goods or services sold when the use

16

United States District Court
Northern District of California

of the counterfeit mark was willful.  15 U.S.C. § 1117(c)(2); *see also Craigslist, Inc. v. Naturemarket, Inc.*, 694 F. Supp. 2d 1039, 1060 (holding that this factor weighed in favor of default judgment where plaintiff asserted copyright, trademark, breach of contract, and fraud claims seeking damages up to $4,900,327.07).

### 4.   The Possibility of a Dispute Concerning Material Facts

With respect to the fifth factor, Catron has not participated in this action and has not made any attempt to contest any of Yelp's material facts or legal assertions or moved to set aside the entry of default despite being served with all papers.

Catron was given ample opportunity to respond to the Complaint and participate in the proceedings.  Yelp served Defendant on July 3, 2013 when copies of the Summons and Complaint were mailed to Catron's business address as listed on his website, adblaze.com. (Dkt. No. 8; Schur Decl. ¶ 3; Pl.'s Mot., Ex. 2.)  This was after two attempts to personally serve Catron at what was believed to be his personal residence and two attempts to personally serve Catron at the business address.  (Id.)[5]  Thus, Yelp properly effected service of process by substitute service.

### 5.   Whether Default was a Result of Excusable Neglect

Yelp properly served Catron with the Summons and Complaint. Yelp made no appearance in this matter and has not responded to Yelp's motion, despite previously responding to Yelp's cease and desist letter.  (Compl. ¶ 17, Ex. 3.)  Consequently, there is nothing suggesting that Catron's failure to appear and litigate this matter is based on excusable neglect. *Shanghai Automation Instr. Co. v. Kuei*, 194 F.Supp.2d 995, 1005 (N.D. Cal. 2001).

### 6.   Federal Rules Preference for a Decision on the Merits

After an examination of these facts in the aggregate, this Court finds that *Eitel* factors one through six outweigh the Federal Rules of Civil Procedure's preference for a decision on the merits. This Court, therefore, recommends an entry of a default judgment.

///

---

[5] In addition, on July 24, 2013 an email was sent to Catron with file-stamped copies of the Summons, Complaint, and initial orders in this action.  (Dkt. No. 17.)  These emails were transmitted to two email addresses from which, it is understood, Catron had previously replied to correspondence.

### III. DAMAGES & INJUNCTIVE RELIEF

After entry of default, well-pleaded factual allegations in the complaint are taken as true, except as to the amount of damages. *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002). To recover damages after securing a default judgment, a plaintiff must prove the relief it seeks through testimony or written affidavit. *Bd. of Trs. of the Boilermaker Vacation Trust v. Skelly, Inc.*, 389 F. Supp. 2d 1222, 1226 (N.D. Cal. 2005); *see Pepsico, Inc.*, 238 F. Supp. 2d at 1175 (citing *Televideo Sys., Inc.*, 826 F.2d at 917-18).

In its motion for default judgment, Yelp seeks statutory damages in the amount of $2,000,000.00 pursuant to 15 U.S.C. § 1117(c). (Pl.'s Mot. at 13.)

Yelp alleges that Catron's actions constituted willful, deliberate, and intentional infringement of Yelp's federally registered trademarks in violation of sections 15 U.S.C. §§ 1114, 1125(a), 1125(c), and 1125(d) of the Lanham Act. (Pl.'s Mot. at 14; Compl. ¶¶ 36, 48, 65.) An allegation of willful trademark infringement is deemed true on default. *Derek Andrew, Inc. v. Poof Apparel Corp.*, 528 F.3d 696, 702 (9th Cir. 2008). Furthermore, "[w]illfulness can be established by evidence of knowing conduct or by evidence that the defendant acted with an aura of indifference to plaintiff's rights . . . ." *Philip Morris USA Inc. v. Liu*, 489 F. Supp. 2d 1119, 1123 (C.D. Cal. 2007).

Here, not only did Yelp allege willful trademark infringement in its complaint but also presented evidence that Catron continued to engage in his illegal conduct after receiving a cease and desist letter demanding that he cease using Yelp's registered trademark. (Compl. ¶ 16., Ex. 2.) Catron responded to this letter stating that he had removed any mention of Yelp from his website. (Compl. ¶ 17, Ex. 3.) Less than two months later, however, Catron used Twitter to promote a new website that infringed on the Yelp Marks. (Compl. ¶ 18; Ex. 4.) Thus, Catron knowingly and willfully infringed on Yelp's rights to the Yelp Marks.

#### A.     Injunctive Relief

Yelp seeks to permanently enjoin Catron from infringing on the Yelp Marks in the future. Injunctive relief is authorized under 15 U.S.C. § 1116(a) to prevent violations under § 1125. Generally, "injunctive relief is the remedy of choice for trademark and unfair competition cases,

18

United States District Court
Northern District of California

1    since there is no adequate remedy at law for the injury caused by defendant's continuing

2    infringement." *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1180 (9th Cir. 1988).  In

3    light of Catron's potentially ongoing violations of 15 U.S.C. § 1125, the Court believes that

4    permanent injunctive relief is appropriate with respect to any Yelp Marks.  *See Verizon California*

5    *Inc. v. Online NIC*,  C 08-2832 JF (RS), 2008 WL 5352022 (N.D. Cal. Dec. 19, 2008)(citation

6    omitted).

7         **B.**        **Statutory Damages Pursuant to 15 U.S.C. § 1117(c)**

8         Yelp may recover statutory damages of "not less than $1,000 or more than $200,000 per

9    counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court

10   considers just". 15 U.S.C. § 1117(c)(1).  Pursuant to § 1117(c)(2), however, if the court

11   determines that the infringement was willful, a defendant may recover a maximum of $2,000,000

12   per mark infringed.

13        Yelp seeks $2,000,000 in statutory damages.  While Catron is subject to the enhanced

14   statutory damages, because his conduct was willful, this amount would be a windfall.  *See* 15

15   U.S.C. § 1117(c)(2).  District courts have discretion in determining the amount of statutory

16   damages, subject only to the statutory minimum and maximum.  *Coach Services, Inc. v. YNM,*

17   *Inc.*, 2011 WL 1752091, *5 (C.D. Cal. May 6, 2011); *see also Harris v. Emus Records Corp.*, 734

18   F.2d 1329, 1335 (9th Cir. 1984) (interpreting 17 U.S.C. § 504(c), a similarly-worded copyright

19   infringement provision, and concluding that district courts have "wide discretion in determining

20   the amount of statutory damages to be awarded, constrained only by the specified maxima and

21   minima.").  The Court should, however, award damages in trademark infringement cases that are

22   sufficient to deter future infringement. *See Playboy Enters., Inc., v. Baccarat Clothing Co.*, 692

23   F.2d 1272, 1274-75 (9th Cir. 1982).

24        Here, Yelp primarily relies on *Philip Morris USA Inc. v. Liu* in support of its request for a

25   statutory damage award in the amount of $2,000,000.  (*See* Pl.'s Mot. at 14.)  In *Philip Morris*,

26   the district court in the Central District of California awarded the statutory maximum under 15

27

28

19

U.S.C. § 1117(c)[6] for willful trademark infringement in the amount of $1,000,000 for each of two trademarks infringed.  489 F. Supp. 2d 1119, 1124 (C.D. Cal. 2007).  There, the defendant transported and unloaded counterfeit cigarettes bearing Philip Morris's marks thereby infringing on the protected marks.  *Id.* at 1122.  The court found that the defendant willfully blinded himself to facts that would put him on notice that he was infringing on another's trademarks by: 1) failing to keep records he would normally keep; 2) never meeting the person who hired him: 3) signing a "bill of lading" without question despite never before having done so; and 4) completely disregarding a third-party's statement that there was a problem with the shipment.  *Id.* at 1123. The court awarded the statutory maximum based on the need to deter the defendant and other counterfeiters, compensate the plaintiff for the damage caused by the defendant's actions, and to punish the defendant for his willful violation of plaintiff's protected marks.  *Id.* at 1124.

Absent from the *Phillip Morris* order cited, however, was the specific conduct of the defendant.  The defendant in *Phillip Morris* imported 52,150 cartons of counterfeit cigarettes in September 2003.  Default Judgment at 2, *Philip Morris USA, Inc. v. Liu*, No. 05-CV-9015 (C.D. Cal. August 7, 2006), ECF No. 29.  An accomplice of the defendant was also indicted by a federal grand jury for the importation and distribution of an additional 106,450 cartons of counterfeit cigarettes.  *Id.*  Therefore, even with a conservative estimate of the price of a carton of cigarettes in 2003, the two million dollars in damages awarded to the plaintiff bears a plausible relationship to his actual damages.  This case, therefore, is not persuasive as it is easily distinguishable on the facts.

In determining the appropriate amount of statutory damages to award on default judgment, courts in this district have considered whether the amount of damages requested bears a "plausible relationship to Plaintiff's actual damages."  *Adobe Sys., Inc. v. Tilley*, C 09-1085 PJH, 2010 WL 309249, at *5 (N.D. Cal. Jan. 19, 2010) (citations omitted).  While a plaintiff in a trademark or copyright infringement suit is entitled to damages that will serve as a deterrent, it is not entitled to a windfall.  *Id.* at *5-6 (rejecting request for $250,000 in statutory damages for the

---

[6] The court considered this case under an older version of this statute in which maximum statutory damages for willful infringement was $1,000,000 per counterfeit mark.

willful infringement of five trademarks and awarding $50,000 in total statutory damages.)  *Tilley* involved the sale of pirated copies of Adobe software through *Amazon.com*, which resulted in duping consumers into believing they had purchased authentic Adobe software.  *Id.* at *4.  The plaintiff only provided evidence of one purchase of the pirated software, which was conducted by one of its employees for $178.99.  *Id.* at *4.  The Amazon.com website showed that the defendants' account received 3 lifetime ratings.  *Id.* at *4.  While, the district court found the evidence sufficient to establish willfulness, the court concluded that— even if an inference could be made that defendant sold 4 units—an award of $50,000 per infringement would be a windfall.  *Id.*  Instead the court awarded Adobe $10,000 per trademark infringement for a total of $50,000.  *Id.*  Other cases involved pirated Adobe software have seen similar results on default judgment.  *See, e.g., Adobe Sys. Inc. v. Brooks,* 2009 WL 593343 at *5 (N.D. Cal. March 5, 2009)[7] (awarded $10,000 per willful infringement of five trademarks totaling $50,000 because the conduct was "likely more than just an occasional recurrence"); *see also Adobe Sys., Inc. v. Taveira*, 2009 WL 506861, at *6 (N.D. Cal. Feb. 27, 2009)[8] (awarded $50,000 per trademark infringed for a total of $250,000 for the alleged sale of more than one thousand unauthorized copies of Adobe software).

In *Microsoft Corp. v. Ricketts*, the plaintiff identified only three units of counterfeit software sold by the defendant, but sought $2,000,000 in statutory damages pursuant to § 1117(c)[9] for the willful counterfeit of trademarks. *Microsoft Corp. v. Ricketts*, C 06-06712 WHA, 2007 WL 1520965, at *4 (N.D. Cal. May 24, 2007).[10]  The court observed that although the plaintiff could not conduct discovery to determine its damages, that, in itself, did not support levying the maximum amount in statutory damages.  *Id.*  Since the plaintiff had not presented an estimate of how much the defendant profited from its infringing activity, the court determined $1000 per

---

[7] The court considered this case under an older version of this statute in which maximum statutory damages for willful infringement was $1,000,000 per counterfeit mark.

[8] The court considered this case under an older version of this statute in which maximum statutory damages for willful infringement was $1,000,000 per counterfeit mark.

[9] The court considered this case under an older version of this statute in which maximum statutory damages for willful infringement was $1,000,000 per counterfeit mark.

[10] The plaintiff in this case also alleged copyright infringement bringing the total award in statutory damages to $12,500.

trademark infringed, or twice the minimum $500 damages allowed by statute, coupled with a permanent injunction, would serve as an adequate deterrent.

While Catron's conduct was willful, it does not warrant the maximum statutory penalty. Yelp has only provided evidence of one sale of a service package by Catron.  At most, this would amount to $2495.00, which is the largest package offered by Defendant for 100 paid reviews. (Compl. ¶ 19, Ex. 6.)  Courts in this district have awarded significantly less in statutory damages on default judgment for more egregious conduct.  In those previous cases, the defendants used protected marks to sell counterfeit merchandise.  Here, in contrast, Catron is not passing off his services being authentic, as evidenced by his website's disclaimer stating that "[t]his website is not associated with or endorsed by Yelp."  (*See* Compl., Ex. 6.)  As provided above, courts in this district have awarded anywhere from $1000 to $50,000 per trademark infringed.  This has resulted in awards for statutory damages in amounts ranging from $12,500 to $250,000.

Yelp alleges infringement on three distinguishable marks. (*See* Compl. ¶ 32.)[11]  Catron's conduct after receiving the cease and desist letter was more egregious.  Thus, the Court recommends awarding Yelp $5,000 (five times the minimum) for each of the three distinguishable trademarks at issue, for a total award of $15,000, for his use of the Yelp Marks on *adblaze.com*.  Thereafter, Catron launched the website *BuyYelpReview.com* and used the three distinguishable trademarks.  The Court recommends awarding Yelp $10,000 for each of the three distinguishable trademarks at issue, for a total award of $30,000, for his use of the marks on *BuyYelpReview.com*.  The Court recommends a total statutory damages award of $45,000.  Yelp did not request, and so the Court does not recommend, damages available for violations of 15 U.S.C. § 1125(d).

Accordingly, this award is consistent with other cases in this district, and takes into account that statutory damages have doubled since most of those cases were decided.  Further, an

---

[11] While Yelp has seven registered service marks, only three are visually distinguishable. (*See* Compl. ¶ 32.) That the same marks are separately registered for different uses does not seem reason enough to award damages based on the registration of seven marks. This is particularly true given that Yelp did not address the infringement of the separate marks, instead opting to discuss them collectively.

United States District Court
Northern District of California

1   award of $45,000 will adequately compensate Yelp for the damages alleged and, coupled with an

2   injunction, should deter Catron and others from engaging in similar behavior.

3   **C.    Attorneys' Fees and Costs**

4   Yelp seeks an award for attorneys' fees under 15 U.S.C. § 1117(a).  (Pl.'s Mot. at 15-16.)

5   Yelp, however, is seeking statutory damages pursuant to § 1117(c), and an election to receive

6   statutory damages, rather than actual damages, precludes an award of attorneys' fees.  *K and N*

7   *Engineering, Inc. v. Bulat*, 510 F.3d 1079, 1082 (9th Cir. 2007) (district court abused its

8   discretion by awarding attorneys' fees where plaintiffs sought statutory damages under §

9   1117(c).  Similarly, Plaintiff's request for costs should be denied, because the recovery is

10  premised on § 1117(a).

11  At the hearing, Yelp conceded that it was ineligible for an award of reasonable attorneys'

12  fees and costs.  Accordingly, the undersigned recommends that Plaintiff's request be denied.

13  **III.    CONCLUSION**

14  For the reasons set forth above, this Court RECOMMENDS that Plaintiff Yelp Inc.'s

15  motion for default judgment against Defendant Timothy Catron be GRANTED IN PART AND

16  DENIED IN PART.

17  The Court recommends that Defendant Catron and his agents, employees, affiliates,

18  distributors, successors, assigns, and any other persons acting in concert or in participation with

19  his scheme be now and forever enjoined from:

20          1.  Registering, using, trafficking in, or benefiting from Internet domain names that

21              incorporate the Yelp Marks or incorporate words, numbers, or symbols that,

22              collectively or in isolation, are confusingly similar to the Yelp Marks;

23          2.  Using the Yelp Marks or any confusingly similar marks in advertisements or

24              otherwise in commerce in any manner likely to confuse consumers as to the

25              association, affiliation, endorsement, or sponsorship of Yelp; and

26          3.  Engaging in any infringing acts involving the Yelp Marks.

27  The Court further recommends that, pursuant to 15 U.S.C. § 1117(c), statutory damages

28  be awarded in the amount of $45,000.

Any party may file objections to this report and recommendation with the District Judge within 14 days of being served with a copy. *See* 28 U.S.C. § 636(b)(l); Fed. R. Civ. P. 72(b); N.D. Civil L.R. 72-3.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *IBEW Local 595 Trust Funds v. ACS Controls Corp.*, No. C-10-5568, 2011 WL 1496056, at *3 (N.D. Cal. Apr. 20, 2011).

IT IS SO RECOMMENDED.

Dated: September 8, 2014

KANDIS A. WESTMORE
United States Magistrate Judge

United States District Court
Northern District of California

24